## Case No. 7,089.

### The ISAAC NEWTON.

[Abb. Adm. 11.] [1]

District Court, S. D. New York. July, 1847.

[1] [Reported by Abbott Brothers.]

Francis B. Cutting and Daniel Lord, for libellants.

C. Van Santvoordt and Henry E. Dodge, for claimants.

BETTS, District Judge. Before considering the merits of the case between the parties. it is proper to dispose of two preliminary objections interposed; the one by the claimants to the maintenance of the action, the other by the libellants to the right of the claimants to offer the defence raised by them.

The claimants insist that by the contract the last instalment did not become payable until after the engine, boilers, &c., were completed, tried, proved, and accepted; that no acceptance of the work as conforming to the agreement has been made up to this time; and that the suit was instituted two days after the boat was delivered to the claimants, without the preliminary trial and proof stipulated in the contract.

Upon this objection it is first to be remarked, that the facts upon which it rests compose an essential feature in the merits of the case. The libellants ground their action upon the allegation that they have fully performed the contract on their part, and they now insist that they have established the allegation by the proofs. Evidence has been given at great length on both sides upon this point, and the claimants contend that the weight of it maintains their defence in this behalf. The question thus becomes one vital to the case upon the merits, involving the fact of performance as well as the time of performance, and no court will turn one party round on a mere technical point. embraced within the merits. if the essential rights of both can be preserved by retaining the cause to final judgment.

In the second place. it is to be observed. that in courts proceeding according to the course of the civil law, there is less reason for rigor in the rule that the right of action must be complete when the suit is commenced. than in common-law courts; because in the former the matter of costs being wholly in the discretion of the court, it can protect the party prematurely sued, by allowing him costs, without the necessity of dismissing the cause for that purpose. as must be done in common-law actions. If the cause of action is matured when the answer comes in. or even at the time of trial, there is no necessity for ordering the suit to be brought de novo; but the court can retain and proceed with it, adjusting the rights of the parties according to their respective equities. The pleadings in the civil law accordingly give to the objection that the demand sued upon is not due. the effect of a dilatory ex-

ception only (Wood, Civil Law, 386), whilst peremptory exceptions, .payment, release, duress, &c., bar and exclude the action forever (Rev. Civ. Code, art. 125).

Such, also, is the function of exceptions in the canon law, from which the admiralty practice was very directly derived. Clarke, Ecc. Prac. § 32; Cockburn's Clerks' Asst. c. 6; Clarke, Adm. Prac. tit. 46. At most, when the exception touches the form of proceeding, (which may, perhaps, include the liability of the defendant to answer the demand eo instanti,) the prosecuting party may at once renew his suit, on rectifying the objectionable act, and paying costs. 13 Poth. 12; Pand. Civ. c. 2, art. 2, § 3.

In this court the answer is permitted to avail as a special plea or exception other than to matters of abatement (Dist. Ct. Rule 76), and both by the rules of this court and the higher authority of the supreme court, amendments are allowed in every stage of the proceedings upon the most liberal terms. Betts, Adm. 57; Sup. Ct. Rule 24; Ben. Adm. Prac. § 483. It is doubtful, under these regulations, whether matter of abatement can be set up at all by answer; but if it can, the court, under the authority of these rules, as well as under the broad provisions of the judiciary act (1 Stat. 91, § 32), may give the party relief at discretion, without compelling him to bring a new action.

To be entitled to claim judgment against the libellants preliminarily, for want of a matured right of action when the suit was commenced. the claimants must have pleaded in abatement or demurred; and by presenting the point on the final hearing upon the merits, it must be regarded as entering into and composing a part of the defence on the merits.

This defence, if formally interposed in equity, would be either a plea in abatement (Beames, Pl. 58, 60), or a plea to the bill. Ib. 61. This subject is largely considered by Judge Story, and he holds that the defence proper to be offered under these pleas is not generally available by way of answer, or at the hearing; and, therefore, the objection ought to be taken ante litem contestatam. Story, Eq. Pl. § 708.

The court will not, accordingly, now pronounce, in exclusion of a consideration of the merits, that the libellant had no existing cause of action when his suit was instituted. Neither, in my judgment, can the objection raised in this stage of the case to the admission of the claimants' defence prevail. The libellants are not entitled to preclude a full investigation of their own demand, or of the merits of the defence.

By taking the boat into their possession on the 8th of October, and appropriating the machinery supplied by the libellants to their own use, the claimants do not adopt the delivery of the boat as a performance of the contract on the part of the libellants, and are in no way estopped from controverting the fact of the fulfilment of the agreement. If the rule be otherwise in respect to articles manufactured by one for another, it cannot govern the case where the work done is applied to property owned by the one obtaining the work, and not by him who does it, and which exceeds in value the alteration or improvement put upon it by the mechanic, nor to contracts executory in their character relating to personal property. Allaire v. Whitney, 1 Hill, 484, 4 Denio, 554; Id., 1 Comst. [1 N. Y.] 305. The claimants in this case being the owners of the body of the boat, of itself of great value; and the undertaking of the libellants being to complete it by adding a steam-engine and machinery of the description specified in the agreement, and the boat never being out of their possession or in that of the libellants. except for that purpose, the claimants had a right to demand and receive the re-delivery of the boat at the time stipulated, or at any time subsequent, without having their acts in so doing operate as an admission that the libellants had fulfilled their contract, or as a discharge of them from its obligation. This may be regarded at law as an admission that they have received some benefit, and that the libellants are entitled to some remuneration for the work done. Lucas v. Godwin, 3 Bing. N. C. 737, 32 E. C. L. 340. But it will not operate as an acknowledgment that the contract has been performed to their satisfaction.

In the present stage of the cause it is intended to discuss two questions only: 1. Whether the agreement has been performed by the libellants according to its true import and meaning? 2. If it has not, what rule of compensation should be adopted towards them, and in protection of the rights of the claimants?

The libellants have received in cash payments made at different periods during the progress of the work, the sum of $35,000. The contract price for which the work specified was to be done, was $46,000, and they claim, in addition, $2,630.47 for work and materials put upon the boat, extra the stipulations of the contract. The claimants claim disbursements and payments in addition to those credited by the libellants, and insist they are entitled to damages to the amount of $30,000, for the delay of the work and detention of the boat from May 15 to October 8, and also because of the imperfect and insufficient performance of the contract in the work done by the libellants.

The first point of difference between the parties, necessary to be disposed of by the court, is the meaning and extent of the contract in respect to the questions in dispute. Although, as might be expected, in a controversy involving so large a demand, the parties have litigated with earnestness every question which the case can fairly raise, yet, in my judgment, the essential matter in dispute relates to the boilers, and whether they fulfil the engagements of the contract re-

specting them. But before taking up this main feature of the case, it will be proper to dispose of one or two other points, upon which a great detail of testimony has been given, not always of the most harmonious character, and which has also been very closely examined and criticized upon the argument.

In respect to the engine and appurtenances, the agreement stipulates various particulars, which the claimants insist the libellants have failed to perform. The libel avers a full performance, except as to time. The deficiencies specified relate to the securing the engine, furnishing the necessary tools, implements and bells, and securing the water-wheels by sufficient iron rims or braces around their circumferences. It is also insisted for the claimants, that various particulars, charged by the libellants in their account as extra work and materials, fall within the meaning of the contract, and are compensated for in the consideration agreed upon for the entire work. Most of these particulars are proper subjects for examination by experts, and under circumstances giving an opportunity for a more thorough understanding of the facts applicable to the subjects than can be possessed by the court itself. They will accordingly be submitted to the consideration of assessors in the reference that will ultimately be directed in the cause.

The evidence in respect to one of these incidental topics is, however, so fully before the court, that it will be disposed of without compelling the parties to go before referees with further testimony on that subject. I refer to the claim of the libellants for extra allowance for fastening the gallows-frame. This is, no doubt, an appurtenance most essential to the well-working and security of the engine, and in that sense might, perhaps, fall within the scope of the agreement. But the preponderance of evidence is clear, that the known usage of steam-engine builders and boat builders, is to regard the frame as a portion of the boat itself, to be fastened when put up by the builder; and if the owner desires to have the skill and experience of the engineer employed, in fastening it more completely, when fitting in the engine, he must secure that service by stipulations in the contract. If this usage is not sufficient of itself to control the construction of the present agreement, the declaration and stand taken by the libellants before the work was put in the boat, evince that it was well understood between the parties that the libellants would not perform that work as part of their contract, and by requesting them to do it after that explicit notification, the claimants must be held to have acquiesced in that interpretation.

This brings us to the great point of controversy between the parties, viz.: whether the boilers put in the boat are of the capacity and construction demanded by the contract? The objection made to them by the claimants is that they are not of the most approved construction for generating steam with economy of fuel, and that they were not so built as to supply to the cylinder the quantity of steam stipulated by the contract. The libellants deny that the claimants have put the true construction upon the agreement, and insist it has been fulfilled according to its import and intent, and that as to the quantity of steam to be supplied, the contract only entitles the claimants to the amount named, when the cut-off is so arranged upon the engine that the boilers will supply it with the piston raised or depressed at a reasonable working distance from the heads of the cylinder; the after action of the piston to be effected by the expansion of the steam so introduced.

The piston has a stroke of twelve feet. It is very clearly proved that if the cut-off is arranged at six feet, or five feet, these boilers cannot be made to supply the engine with steam beyond a pressure of about fifteen pounds to the square inch, when in full action with the throttle-valve wide open. Experienced engineers, on the other hand, state, and this agrees with the theories of books of science, that if the cut-off is protracted so as to diminish sufficiently the aperture between the piston and the heads of the cylinder, the amount of steam generated by boilers of the capacity of these, would furnish forty pounds pressure to the square inch upon the piston, being the head or force claimed by the claimants. The measure of the stroke of the piston at which the valve should close so as to preserve the head of steam required and the full action of the engine, is not proved. This theory rests upon a reason obvious enough, even to those unskilled in the art. An instantaneous jet, with the throttle-valve to this engine opened wide, would furnish steam enough to fill a narrow vacuum, and yet diminish the force still acting within the boiler so little as to leave the gauge standing at nearly its highest point. In proportion as the quantity is abstracted from the boiler will be the rate of pressure there, unless the apparatus for generating steam is such as to renew the supply with extreme rapidity. It is manifest, therefore, that a steady use of steam from the boiler, through a discharge-valve of the capacity of this throttle, would require, in order to maintain a pressure of forty pounds to the inch, an average pressure at command greatly exceeding that amount, or that steam should be evolved by the boilers as rapidly as it is used by the engine.

There is evidence furnished by the libellants from engineers of learning, and from scientific treatises on the use of steam, conducing to prove that the modern and improved method of working steam-engines is, to fill the cylinder partially with steam from the boilers. depending then on its expansive action, as thus the force it continues to ex-

ert in expansion is so much saved in the consumption of steam. And various experiments with engines, particularly stationary ones, have been referred to as demonstrating that in this mode of employing steam there is not only economy of fuel secured, but an actual increase of power. The argument deduced from this evidence is, that the libellants were bound to construct boilers only with a view to their use in this manner, and not to have them capable of filling one half or more of the engine with steam, at the pressure indicated by the contract. This point, however, must be determined by the meaning of the contract. Should it fail to supply the means of a clear and satisfactory interpretation within itself, then, undoubtedly, extraneous considerations may be brought to bear to point out and determine the true intention of the parties.

The claimants, as appears by the contract, came in as substitutes of parties who had a previous agreement with the libellants to build an engine for this very boat, then in course of construction at William H. Brown's ship-yard. The cylinder, by the first agreement, was to be seventy-two inches in diameter, and the piston to have eleven feet stroke, and the compensation to be paid the libellants was $37,500. That agreement was abrogated by the present one, and an engine of greater force, at an increased rate of compensation, was stipulated to be built. The cylinder was to be "eighty inches diameter of bore and twelve feet stroke of piston, of the best materials and workmanship, and of sufficient and suitable size and strength in all its parts, and to include all modern improvements; the engine to be secured in the boat in the best and strongest manner, and in all respects as an engine of such unusual power and capacity requires, for its firmness, security, and permanency."

It is to be remarked upon these stipulations that the claimants do not exact an agreement to fit up the engine so as to enable them to work it conformably to "all modern improvements," but so to build it as "to include all modern improvements." This phraseology, in its connection as well as natural import, evidently looks to such construction of the cylinder with the apparatus as should be necessary to its operation, and not to the manner by which it was to be operated. The engine to be built was one of power and capacity untried by any river boat. The plain purpose of the agreement, signified in this language, was to have this engine of such strength in itself and its parts, and so stably and firmly secured, that this immense new power which its capacity would furnish, could be safely used in running the boat. The agreement in itself shows that the parties had in view the engines of the fastest boats then running on the North river, and that the dimensions of this cylinder and the other branches of the engine were projected with intent to acquire on this occasion a power to be put in use, surpassing theirs in proportion to the difference of cylinders.

The libellants contend that the agreement required of them no more than to secure to the claimants a command of steam which would enable the engine to be worked at the high power indicated, "according to modern improvements;" that is, by injecting the force or head of steam indicated, and then having the cut-off so arranged as to work the engine by the expansive force of the steam; or at most, that the engine of the Isaac Newton was to be supplied with steam, not to the same actual amount as that used by the fastest river boats, but only proportionately to the relative sizes of the engines; and thus a computation is made by some of the witnesses tending to show that, upon the principles of that proportion, twenty-five inches of steam in the cylinder of the Isaac Newton, with a cut-off at six and a half feet, is equivalent to thirty-seven inches in the cylinder of the Hendrick Hudson, as that boat is usually run with her cut-off at five and a half feet.

The language of the contract is this: "The boilers to be of the best Pennsylvania wrought iron, and of the most approved construction for generating steam with economy of fuel, and of a size to supply the cylinder with steam at as many pounds pressure to the square inch on the piston, when working with the throttle wide open, as are used by the fastest steamboats on the Hudson river when going at their highest rate of speed."

If any implication of a proportion to be maintained between the engine of the Isaac Newton and the Hudson river boats is contained in this stipulation, it clearly is, that the proportion between the cylinder and boilers of the Isaac Newton shall be correspondent to that in the fastest boats, between the same parts of their engines. That proportion is not measured by dimensions, but by the result of the coöperation of the respective parts,—the amount of pressure upon the square inch whilst the boat is at her highest speed, and using a full head of steam up to half the capacity of the cylinder. This, it seems to me, furnishes a plain key to what the parties contemplated in this agreement.

The notion evidently was, that important advantages would be secured by having this cylinder augmented to an extraordinary power and worked at its highest capacity. The parties have fixed with precision its length and diameter,—eighty inches diameter in the bore, and twelve feet stroke of the piston,—and they engage boilers to be furnished of a size to supply the cylinder with as many pounds pressure on the square inch on the piston, when working with the throttle wide open, as are used by the fastest steamboats on the Hudson river, &c., &c. It is to be assumed that the parties well understood between themselves what the facts were in respect to the steamboats to which reference

was made, and that such reference communicated to them a clear and precise idea of the extent of the engagement. This presumption is made indubitably certain by the proofs. The libellants were manufacturers of engines for boats of that description, and the claimants owned boats falling within the class. The purport of the agreement would thus seem scarcely to admit of doubt. It denotes distinctly the intention to give the Isaac Newton the same measure of power upon her engine which these boats have on theirs at their full and greatest speed. The evidence shows that power to be full forty pounds pressure to the square inch, and in some instances exceeding fifty pounds. The boats chiefly referred to as falling, without dispute, within the class of fastest steamboats then running on the Hudson river, are the South America, the Hendrick Hudson, the Mountaineer, (in all which the claimants were part or full owners,) the Niagara, the Thomas Powell and the Oregon; and perhaps the St. Nicholas, the North America, &c., should be ranked amongst them also. With some variety of statements, the witnesses generally agree that the South America used from thirty-three to forty-five pounds steam; the Hendrick Hudson, thirty-eight to forty-five pounds; the Thomas Powell, from forty-five to fifty pounds; the Oregon, from thirty-eight to forty; the Niagara, St. Nicholas, and North America, were also shown to carry about forty pounds of steam, all when running with their throttle-valves wide open.

The boats referred to usually had their cut-off half the length of the piston. The Thomas Powell used hers, at times, at eight feet, carrying fifty pounds steam. The stroke of the piston was eleven feet, and the diameter of the cylinder forty-eight inches. The Hendrick Hudson had also an eleven feet stroke, and her cut-off was arranged at about half way.

Both upon the language of the contract and in view of the concomitant facts embraced within the reference made to the other boats upon the river, it was, in my opinion, the intention of the parties that the boilers should be so constructed as to furnish the engine with at least forty pounds pressure of steam to the square inch on the piston, (or boilers,) with the throttle-valves wide open, using such length of cut-off to the piston as was customary with those other boats.

But the testimony is clear that no such amount of steam could be obtained from these boilers. In truth it was with great difficulty that that head of steam could be raised when the engine was at rest, and when in motion, it could not be maintained above twenty-five inches of pressure, with the throttle-valve only about one quarter open. When open to its full width, the steam, with all the power of the blowers attached to the engine, could not be kept above fifteen to eighteen pounds of pressure.

It is urged for the libellants that blowers of an improved character would have been furnished, but the agent of the claimants preferred those which were put in; when, with the use of such other blowers, the head of steam required could have been readily generated in those boilers. I do not feel competent to decide, to my own satisfaction, to what cause the deficiency of the boilers is to be ascribed. Various defects in their construction have been supposed, particularly in the back connections; so, also, as to the thickness of the iron, the steam chimney and jacket; and it may well be that the blowers contributed in some measure to the general inadequacy of the boilers to accomplish what they were expected to do. I do not undertake to determine, upon the knowledge of the facts communicated by the testimony, whether it is necessary to enlarge the circumference or length of the boilers, or to change their interior construction. There may be other mechanical means adequate, through other alterations of the engine and apparatus, to secure the result called for by the contract. It is plain to my mind, however, that the claimants have not obtained the head and power of steam contracted for, and that they have sustained injury by the failure; and the decree in the cause will adopt proper measures to enable the court to appreciate more satisfactorily the extent of that damage, and probably the causes or deficiencies occasioning it, and the manner by which it may be remedied.

The water-wheels are appurtenances to the engine, and were, as part thereof, to be built and secured in the best manner. On trial they were found insufficient to support the power of the engine, and the clear weight of the evidence is, that the inadequacy arose from the want of iron rims upon the circumferences to support and strengthen the arms in their action. This is, it appears, an improvement of common use, and the claimants were entitled to have it applied to these wheels.

The contract was not completed within the time stipulated. The libellants engaged to deliver the work complete on the 15th of May, and did not offer a delivery of it till the 8th of October thereafter. Had the claimants refused to accept the work at that time, and this action been brought upon the refusal, and to enforce the contract against them, there would be ground for the claim that all reasonable damages incurred by such delay, should be secured to the claimants, before they could be compelled to fulfil the stipulations on their part. It might not stand on the footing of a contract rescinded as to the claimants, by occasion of non-performance on the part of the libellants, as, under the characteristics of this contract, the perfect performance by the latter of their engagement was not a condition precedent to the obligation of the former. The agreements, to a certain extent, were concurrent and independent, so that a very large proportion of the consideration-money, payable

by the claimants, was to have been received by the libellants anterior to the period fixed for the full performance of the terms of the contract.

Besides, the work of the libellants was to be put upon a boat owned by the claimants; and the remedy of the latter would not be by an abrogation of the contract, for that would leave neither themselves nor the other party in the same position as if an entire failure to perform had occurred. The claimants could not repossess themselves of the body of the boat, without compensating the libellants for the work bestowed upon her: nor could the latter retain her, without allowing the former all damages because of the insufficient performance of the agreement. When, therefore, the boat was received by the claimants, such acceptance, in the manner in which it was made, did not admit a performance of the contract by the libellants, nor in any way release or relieve them from their responsibility for an imperfect performance. Still, the claimants, by continuing their superintendence of the work as it progressed, and by paying instalments after the 15th of May, must be regarded as having so far acquiesced in the delay of performance as not to be now able to put forward that delay as a substantive ground of damages. They are justly entitled to remuneration for any expenses or disbursements incurred in consequence of the prolongation of the work by the libellants, and their claim to damages on this head must be limited to these particulars.

In so far as the execution of the contract is short of the agreement, there is no difficulty in giving the claimants a proper indemnity, by subtraction from the balance yet unpaid, or by way of recoupment, upon the amount otherwise recoverable by the libellants. Barber v. Rose, 5 Hill, 76, and cases there cited. Although the engine, at the commencement of this suit, had not been tested and proved according to the provisions of the contract, and had not been then completed and put in successful operation by the libellants to the satisfaction of Isaac Newton, as stipulated in the contract, but various and important particulars still remained to be done; and although the claimants had not accepted the engine and appurtenances as a true performance of the contract on the part of the libellants, yet the claimants having taken the boat with her engine and appurtenances, into their employment, and having since retained it and kept it running upon the North river, they must be held to have thereby admitted their liability to pay the libellants whatever was due them (after reasonable allowances for defective performance of the contract,) for the machinery put into the boat. In that point of view the action is not prematurely brought. If the claimants intended to put themselves upon their strict rights in this respect, it would have been necessary for them to have declined receiving the delivery of the engine until it had been tested and proved by the libellants, according to the agreement. Perkins v. Hart, 11 Wheat. [24 U. S.] 237.

After taking it into their own possession as their property, and continuing to hold and use it as such, they cannot controvert the right of the libellants to be paid the value of the work. Linningdale v. Livingston, 10 Johns. 36. The principle of this decision, as subsequently expounded by the court, supposes a performance of the contract with variations from the agreement, probably with the assent of both parties, or an extension of the time within which the agreement was to be performed, with the like assent. Jackson v. Rosevelt, 13 Johns. 97.

In the delivery and completion of the boat and machinery, both parties manifestly acted under the idea that the contract was to regulate their respective rights; the libellants placing themselves upon the assertion of a complete performance in every thing, except as to time, and the claimants invoking the agreement as ground for the remuneration they demand because of a defective performance.

In this court it matters not whether the remedy be on the agreement, or the agreement be revoked, and the remedy rests on a quantum meruit or quantum valebat. The form of proceeding and pleading is substantially the same, and accordingly the distinction adverted to or marked with strict emphasis in cases at common law, touching the form of action upon rights so circumstanced, has no application or authority in maritime cases prosecuted in admiralty. Jackson v. Rosevelt, 13 Johns. 97; Barber v. Rose, 5 Hill, 76. The libellants may accordingly retain and pursue their action as instituted, and the claimants will be allowed, against any balance established against the boat, a just recompense for imperfect performance, and damages and expenses, to which they have been subjected in consequence of the prolongation of the work.

The question of interest and costs will be reserved until the final hearing upon the report of auditors or assessors, to be provided for by the decree.

The following decree to be entered will point out specifically the method by which the objects which have been specified are to be obtained.

In view of the pleadings and proofs in this cause, it is considered by the court:—

That the defence set up on the part of the claimants that the contract in the pleadings set forth was not performed and fulfilled by the libellants within the time therein stipulated, is no bar to a right of action thereupon.

That the claimants being owners of the said steamboat Isaac Newton, their demand of her delivery from the libellants, and their acceptance of her when delivered, was no ac-

ceptance of the engine and boilers put in the boat by the libellants, as being constructed and completed pursuant to the contract aforesaid; and the claimants are no way thereby precluded from the defence, that the contract has not been performed by the libellants according to its true intent and meaning, or from claiming a just recompense in case a nonperformance or imperfect performance thereof is proved.

And in view of the allegations of the libel, and the proofs of the parties, and the import and effect of the said contract between them, it is found by the court:—

1. That the engine, with its appurtenances, fastenings, and materials, (except the boilers and bracings of the water-wheels to be specially noticed in this decree,) was made and completed by the libellants in every particular, equal to what was stipulated and required in that respect by the said contract.

2. That the boilers built and furnished the said boat by the libellants were not of the most approved construction for generating steam with economy of fuel, according to the engagements of the contract; but on the contrary, did not include all the modern and well-known improvements in that behalf, and were so constructed as to require and consume an amount of fuel much greater than is used in boilers of approved construction, with such modern improvements, to generate an equal amount or proportion of steam.

3. That the said boilers were not so constructed and built as to supply the cylinder with as many pounds pressure of steam to the square inch on the piston, when working with the throttle wide open, as are used by the fastest steamboats on the Hudson river when going at their full and greatest speed, according to the engagement of the said contract; but on the contrary, whilst the boats so referred to, when so running, use forty pounds and upwards of steam to such square inch, the engine of the Isaac Newton is supplied by these boilers, when the throttle is wide open, with not more than a pressure of fifteen pounds of steam to the square inch on the piston.

4. That the engine and boilers of said boat were not tried and proved by the libellants or others previous to the commencement of this action, or afterwards, with as much pressure of steam on each square inch of the piston as is usual or customary on boats on the Hudson river, when going at their greatest, fullest, and highest speed, according to the agreement aforesaid; but on the contrary, whilst the boats so referred to and so going, had and used for their usual and customary pressure of steam, forty pounds and upwards to the square inch on their pistons, the engine and boilers to this boat were not and could not be so tried and proved with a pressure of steam as aforesaid, exceeding twenty-seven, or thirty pounds at the utmost, to the square inch on the piston.

5. That the engine in the said agreement of the libellants engaged to be built, had not, at the commencement of this suit, been completed and put into successful operation and motion, under the superintendence and to the satisfaction of Isaac Newton, as stipulated in said agreement; but on the contrary, the water-wheels built and furnished by the libellants as a material part thereof, had not been and were not secured and supported at the rims or external parts thereof, in such manner as is necessary for their firmness, security, and permanency, when worked under the great power contracted to be given to the engine of this boat; and said wheels have proved inadequate and insufficient in strength for the successful operation and running of said boat.

6. It is further found by the court, that the claimants had not, by themselves or agents, at the time this suit was commenced, accepted and received the said engine and boilers, with their appurtenances, or any part thereof, from the libellants, as a true performance and fulfilment on the part of the libellants of the contract aforesaid; nor had the said engine and boilers been constructed, put up, and completed under the directions and with the assent and approval of the claimants, as to the particulars in this decree before specified, in such manner as to discharge or relieve the libellants from a true performance of the said contract, according to the terms and obligations thereof.

7. It is accordingly considered by the court, that the claimants are entitled to compensation in this suit, by way of abatement or subtraction from any balance remaining due the libellants upon the said contract, because of the defective and insufficient performance thereof by the libellants.

8. It is further found by the court, that by superintending the said work during its whole progress, and urging its completion, up to the time of its delivery, and long after the period fixed in the contract for such completion, and by then permitting the same to be delivered by the libellants as under and in fulfilment of the contract, without notice to them after the time for performance had arrived that damages would be claimed because of the delay, and without notice or intimation when the work was delivered that it would not be accepted under the contract for that cause, the claimants have waived the right to set up the non-execution of the contract by the libellants within the time therein stipulated, as an absolute failure to perform the same, or as thereby being exonerated or discharged from their obligation to make the payments in said contract engaged to be made on their part. But it is considered by the court, that the claimants are entitled to be reimbursed and satisfied for all charges, expenses, and disbursements actually and necessarily incurred by them during the period of such

delay, and in consequence thereof; not, however, including therein any estimated value of said boat for that period, if finished, nor any supposed profits to be derived from her employment or hiring therefor.

9. It is further found by the court, that the libellants were not bound by the said contract to fasten the gallows-frame of said boat with iron work, nor to supply and put up the upper pipes, substituted, at request of the claimants, for the one first prepared to lead the steam from the boilers to the steam-chest, nor to put up and fasten the suspension-frame for the blower engines; and are entitled to a reasonable compensation therefor, over and above the payments stipulated in said contracts.

10. It is further found by the court, that the libellants are not entitled to extra compensation for any work, arrangements, or conveniences, applied to the boilers themselves, it appearing to the court that none have been supplied beyond the modern improvements used in approved boilers on the Hudson river at the time said contract was made. But as to the other particulars claimed in the bill of the libellants attached to their libel as extra and not embraced in the said contract, their allowance or disallowance will be deferred to the coming in of the report on the reference ordered in the cause.

Wherefore it is ordered and decreed by the court, that the libellants recover in this action the arrears and balance of moneys due them, upon the aforesaid contract for building the said engine, boilers and appurtenances thereto, and securing the same in the said steamboat Isaac Newton; and also compensation for the particulars above specified, extra and beyond the amount stipulated to be paid by said contract; and to be ascertained and adjusted as hereinafter directed; subject, however, to an allowance and credit to the claimants, to be ascertained as hereinafter directed, because of the defective and imperfect performance of the said contract in the particulars before specified, and because of their expenses and disbursements in consequence of the delay of the libellants to perform their contract within the time therein stipulated.

It is accordingly ordered and decreed by the court, that it be referred to assessors or commissioners, to be designated as hereinafter directed, to inquire and ascertain the fair and reasonable value and worth of the labor and materials charged by the libellants as extra, beyond the said contract in the account attached to their said libel, and also to inquire and ascertain whether the iron pans to hold cement, the sheet iron flooring laid in the fire-rooms, or any and every other item of said account, are properly and fairly appurtenances to the engine or boilers, as modern improvements to approved boilers and engines, known and used on the Hudson river in the year 1845; and also to inquire and ascertain whether the charges for tools, bells, and fixtures included in said account, embrace any, and what, which are necessary tools, fixtures and bells for this engine.

And it is further ordered and directed, that the said assessors or commissioners inquire and ascertain what would be the reasonable cost and expense of so altering and improving the said boilers, "as that they shall supply the said engine at least forty pounds of pressure of steam to the square inch of the piston of said engine, with the throttle wide open, and also so as to reduce the consumption of fuel proportioned to that consumed by boilers of approved construction, with the modern improvements, employed on the Hudson river, anterior to November 1, 1845;" and also to inquire and ascertain the expense or value of braces or rims to the water wheels, sufficient to render the same secure when the said engine is worked with the power aforesaid; and also to inquire and ascertain the amount of payments and disbursements actually and necessarily made by the claimants between the 15th day of May and the 8th day of October, 1846, for wharfage for said steamboat, for insurance on her, and for keeper's wages on board her; and report to the court upon the particulars aforesaid, with all convenient speed.

And it is ordered, that each of the parties aforesaid nominate to the court in writing, within ten days, three competent and disinterested persons, as assessors or commissioners in this behalf, from whom the court may designate and appoint the assessors or commissioners to whom the matters aforesaid are referred.